## CENTRAL PAPER CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10205.

Circuit Court of Appeals, Sixth Circuit.

Dec. 2, 1946.

W. A. Giffen, of Chicago, Ill. (Wilbur A. Giffen, of Chicago, Ill., on the brief; KixMiller, Baar & Morris, of Chicago, Ill., of counsel), for petitioner.

Harry Marselli, of Washington, D. C. (Douglas W. McGregor, Sewall Key, J. Louis Monarch, and Melva M. Graney, all of Washington, D. C., on the brief), for respondent.

Before HICKS, MARTIN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The petitioner, Central Paper Company, Inc., seeks a review of the decision of The Tax Court of July 21, 1945, whereby The Tax Court determined that for the fiscal year ending June 30, 1940 there were deficiencies in income tax and declared-value excess profits tax in the respective amounts of $6,804.13 and $5,623.25, or a total of $12,427.38. The deficiency resulted from the failure of the taxpayer to include as income for the taxable year in question the sum of $42,529.98, representing the difference between the par value and the acquisition cost to the petitioner of certain Convertible Trustee's Certificates, issued under a plan of reorganization of the petitioner's predecessor, which certificates the petitioner purchased at a discount during the years 1937, 1938, 1939 and 1940. Of this amount, however, only $42,467.98 is involved in this review, the difference of $62 being conceded because the amount involved is too small to justify an issue.

The petitioner, a Michigan corporation, was incorporated on February 6, 1935 pursuant to a plan of reorganization under § 77B of the Bankruptcy Act, U.S.C.A. § 207. Its predecessor, the Central Paper Company, was dissolved immediately after February 6, 1935. Both corporations were engaged in the manufacture of pulp and paper at Muskegon, Michigan. The old company owned certain Canadian assets consisting of several timber licenses and 212 acres of adjoining Canadian freehold lands upon which there was a sawmill. Immediately prior to the reorganization of the old company it had outstanding an issue of First and General Mortgage 7% Sinking Fund Bonds in the then principal amount of $321,300, which were secured by a first lien on the Canadian assets and a second lien on the other or general assets of the old company. The old company was not insolvent under provisions of the Bankruptcy Act. The new company was in a solvent financial condition at all times material to the case.

Pursuant to the reorganization plan, the taxpayer acquired all the assets and liabilities of the old company and issued therefor to the holders of the outstanding shares and bonds and to unsecured creditors of the old company its own shares, bonds and notes. A trust arrangement took the place of the old company's First and General

Mortgage 7% Sinking Fund Bonds. Under this trust agreement the taxpayer transferred to a trustee the Canadian assets and 32,130 shares of its 3%-6% cumulative non-convertible preferred stock, $10 par, or a par total of $321,300. The holders of the old 7% bonds then released their lien on the Canadian assets and also their claim against the other assets of the old company and accepted in lieu thereof Convertible Trustee's Certificates, dated February 1, 1935, and maturing October 1, 1948, having a face amount equal to the par amount of the old bonds. The certificates stated that the holder was the owner of an undivided share, to the extent of the principal sum stated in the certificate, in the properties held by the Trustee and that the holder was entitled to interest if and when the Trustee had sufficient funds for that purpose. They also contained this provision:

"No obligation shall be asserted or be enforcible against the Trustee or the Company, or either of them to pay this Certificate or any interest accrued thereon, and each original and successive holder of this Certificate accepts the same upon the express condition that the sole remedy of such holder shall be by recourse to the properties, securities and/or cash in the trust estate held by the Trustee as security for the Certificates of this issue under and subject to the terms of said Indenture and in the manner therein set forth."

The Certificate also provided that the holder at his option could surrender the certificate to the trustee and receive, in lieu thereof, shares of petitioner's preferred stock held by the trustee on a basis of par for par. The certificates so converted were to be cancelled. The taxpayer agreed to establish a "Sinking Fund B" for the payment of principal or interest on the certificates by the payment of a certain percentage of its net profits payable in cash or "in whole or in part by the delivery to the Trustee of any Certificates secured hereby, taken at their actual cost to the Company." It further agreed to assist the trustee and use its own best efforts to maintain and extend the Canadian timber licenses and to pay to the trustee all fees and governmental charges on such licenses and neces-

sary expenses of protecting the same, and to pay to the trustee, in the event of the loss or termination of such licenses, $25,000 in five annual $5,000 installments, and to pay to the trustee compensation for services in the execution of the trust and all expenses of the administration. The taxpayer had the option at any time prior to October 1, 1948, to pay to the trust a sum sufficient to pay the then principal amount of all outstanding certificates, together with unpaid interest and trustee's fees and expenses, and to receive a reconveyance of all properties and securities remaining in the trust estate after certificate holders had been given an opportunity to exercise their rights of conversion into non-convertible preferred shares. If all certificates were paid in full or cancelled before October 1, 1948, all properties and securities and cash remaining in the trust estate were to be turned over to the taxpayer and the trust terminated. Unless sooner terminated by the cancellation of all outstanding certificates, the trust was to terminate as soon as practicable after October 1, 1948, by the distribution of the trust estate pro rata among the registered holders of outstanding certificates at that time. All receipts from timber and licenses, all dividends on the preferred, and all money received by the trustee from any source for the benefit of the certificate holders were to be used, first, for the payment of interest on the certificates, and, second, to reduce the face amount thereof by pro rata distribution among the certificate holders, except that the trustee could retain such funds as necessary to protect the property for the benefit of certificate holders.

The taxpayer purchased from time to time from the holders thereof at prices usually below par trustee's certificates aggregating $208,900, as follows:

| Fiscal Year Ending | Cost | Par |
|---|---|---|
| 1937 | $ 59,330.12 | $ 87,200.00 |
| 1938 | 30,251.00 | 33,400.00 |
| 1939 | 13,257.50 | 17,400.00 |
| 1940 | 63,593.40 | 70,900.00 |
| Total | $166,432.02 | $208,900.00 |

On April 15, 1940, the $208,900 certificates were transferred to the trustee and thereupon 20,890 of the 3%-6% non-convertible cumulative preferred shares of the taxpayer were transferred to it by the trustee.

On April 5, 1940, the taxpayer notified the trustee that it elected to exercise its option to pay the trust the then principal amount of trustee's certificates outstanding, together with interest due. Following notice given by the trustee to the certificate holders of the right to convert into preferred shares of the taxpayer, which right was exercised in the amount of $12,700 par value of certificates, the taxpayer on April 20, 1940 paid to the trust $60,648, which was in full payment of the then outstanding certificates in the principal amount of $50,400 and $10,248 interest. The trustee then retired the outstanding certificates in cash. After paying all expenses of the trust the trustee during May 1940 distributed the remaining assets to the taxpayer in final liquidation and the trust was terminated. Upon such liquidation, the taxpayer received in addition to $4,841.20 in cash and some Canadian real estate 9,970 shares of the non-convertible cumulative preferred stock. The preferred shares received from the trustee through the exchange of the trustee's certificates and through dissolution of the trust, totaling $308,600, were retired.

The Tax Court held that the amount of $42,467.98, being the difference between the par value and the purchase price of the trustee's certificates which it had purchased and transferred to the trustee on April 15, 1940 was income to the taxpayer during the fiscal year ending June 30, 1940 and should have been included in the taxpayer's return for that year. The ruling was based upon the decision of the Supreme Court in United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, in which it was held that a debtor realizes income by the acquisition of its bond or the cancellation of its debt for less than the face amount of the obligation.

■ The taxpayer concedes the rule established by the Kirby Lumber Co. case. It contends, however, that the rule is not applicable to the present case because the trustee's certificates which it purchased did not constitute anyone's debt, much less the debt of the taxpayer, and that the obligations or liabilities which the taxpayer had under the trust agreement were all contingent liabilities instead of fixed obligations, to which the rule of the Kirby Lumber Co. case is restricted. We agree with the contention that the rule of the Kirby Lumber Co. case is not applicable to a case involving only a contingent liability. Corporacion DeVentas, etc., v. Commissioner, 2 Cir., 130 F.2d 141; Terminal Investment Co. v. Commissioner, 2 T.C. 1004. The taxpayer's liability arising out of its obligation to pay into the sinking fund for the redemption of certificates a certain percent of its net profits was a contingent one. Likewise the right which it had to retire its preferred stock by purchasing certificates and turning them over to the trustee was a right rather than a liability. It is also true, as contended by the taxpayer, that its original obligations to transfer the Canadian assets and the 32,130 shares of its preferred stock to the trustee had been performed and was not an outstanding liability. Accordingly, none of these provisions of the trust agreement would bring the case within the scope of the Kirby Lumber Company rule. Nor were the certificates themselves the direct or express obligation of the taxpayer. However, for all practical purposes, they were the obligation of the taxpayer. Although it did not agree to pay any certificate, yet it put in pledge out of its own assets the property out of which the certificates were to be paid. So much of that property as was not needed to pay the certificates reverted to the taxpayer. Each purchase of a certificate at a discount resulted in a corresponding increase of available assets to the taxpayer. The certificates were exchanged for perferred stock which was then retired. There was a decrease of liabilities with corresponding increase of net assets, constituting taxable income. Helvering v. American Chicle Co., 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891. The case falls within the rule of the Kirby Lumber Co. case, irrespective of the absence of an express promise to pay the certificates in cash. The taxpayer, solvent at

·all times, actually assumed an obligation that the certificates would be paid in any event out of its assets which it placed in lien for that purpose. There is no material difference between payment by cash and payment by transfer of property of equal value.

We do not agree with taxpayer's further contention that the transaction falls within the rule announced in Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785, where cancellation by a lessor of rent owed by a lessee was treated as a gift, and exempt from federal income tax. The sale of the certificates at a discount was not a gratuitous release of part of an indebtedness in favor of the certificate holder. It was a bona fide sale in the open market of his investment, `due obviously to his preference to receive immediate cash in a reduced amount than to receive preferred stock or to wait for liquidation of the trust.

■ There is considerable more merit to taxpayer's final contention that the income so realized was for tax purposes realized in the fiscal year in which the certificate was purchased rather than in 1940 when it was turned in to the trustee in exchange for preferred stock, which was thereupon cancelled. The question presented invites discussion. However, it is not an open one in this Circuit. On the authority of Tennessee Consolidated Coal Co. v. Commissioner, 6 Cir., 145 F.2d 631, we rule with the taxpayer. See also Garland Coal & Mining Co. v. Helvering, 64 App.D. C. 144, 75 F.2d 663; Montana, Wyoming & Southern R. R. Co. v. Commissioner, 3 Cir., 77 F.2d 1007. The question was not discussed in the opinion of The Tax Court. The record shows, however, that the point was raised in taxpayer's motion for reconsideration filed with The Tax Court, which is sufficient for consideration on appeal. Bell v. Commissioner, 3 Cir., 139 F.2d 147.

The ruling of The Tax Court is modified to the extent·indicated above. The cause is remanded to the Tax Court with directions to redetermine the deficiency assessment for the fiscal year ending June 30, 1940 by eliminating from consideration any income or profit resulting to the taxpayer by reason of the purchase by it of the trustee's certificates during the fiscal years ending June 30, 1937, 1938 and 1939.